SPOHN v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellant.*

1. **Carriers of Passengers, Duty of:** RAILROADS. A carrier of passengers by railroad is bound to use the utmost practicable care, not only to safely transport its passengers, but to protect them in transit from violence and insults from those on the train, including fellows passengers. A failure to do so will render the carrier liable for any damage naturally and directly resulting therefrom. (*Affirming Spohn v. Railroad,* 87 Mo. 74.)

VOL. 101—27

2. **Appellate Practice:** SETTING ASIDE VERDICT : IMPROBABLE TES-
TIMONY. A judgment for the plaintiff will not be reversed upon a
second appeal upon the ground of the apparent improbability of
his testimony, where it cannot be said that such testimony, in the
light of that given by other witnesses, is too incredible to be pos-
sibly true and where the first verdict was set aside by the appellate
court because of the great improbability of plaintiff's story.

3. **Practice:** EVIDENCE : DECLARATIONS OF AGENT : IMPEACHMENT.
An agent who has testified to facts material to the issue may be
contradicted by evidence of statements and declarations made by
him inconsistent with his testimony, notwithstanding such incon-
sistent statements were made after the event in issue and as a
mere narrative of it.

4. —— : ——. In an action by plaintiff for personal injuries sus-
tained in jumping from defendant's moving passenger train,
because of the improper conduct of the conductor, it was relevant
for plaintiff to explain to the jury the reason for such an act on
his part.                                   .

5. **Carriers of Passengers, Duty of:** ACTING UPON APPEARANCES :
INTELLIGENCE OF PASSENGER. A railroad company as a carrier of
passengers is not necessarily responsible for any act a passenger
may do in consequence of some breach of duty on the part of its
employes. It is liable only for such results as are natural and
probable consequences of such breach of duty, The agents of the
company are not chargeable with knowledge of a passenger's
" intelligence and experience in life." They are authorized to act
upon the appearances before them, where they have no other
notice of the facts.                        .

6. **Appellate Practice:** SPECIAL ISSUES : REPEAL OF LAW. The
action of the trial court in submitting or refusing to submit special
issues to the jury will not be reviewed in the appellate court where
the law authorizing such submission has been repealed since the
trial of the cause.

*Appeal from Cole Circuit Court.*—HON E. L.
EDWARDS, Judge.

REVERSED AND REMANDED.

THIS is an action for personal injuries to plaintiff
alleged to have been suffered while a passenger on defend-
ant's railway..

The case was here before, and is reported by the same title in 87 Mo. 74. In some of its phases it is so remarkable that a somewhat full statement of it, as presented by the record of the last trial, will be given.

The petition, after formal allegations of defendant's incorporation and ownership of the railway on which plaintiff was hurt, alleges in substance that on March 6, 1880, he was a passenger for hire thereon, and about midnight certain persons and passengers then and there on said train of cars, while plaintiff was under the charge and protection of the conductor of said train, who was a servant of defendant, did then and there wrongly pretend and say to plaintiff that it was their purpose then and there to rob plaintiff and to then tie plaintiff and throw him out of the train while the same was in motion, whereby plaintiff became greatly excited and alarmed   *   *   *   and the said conductor, then and there knowing the excited and alarmed state of mind of the plaintiff, not only failed and refused, as he was in duty bound, to protect and defend plaintiff against such apprehended danger, and to use every exertion and endeavor to quiet plaintiff's excited state of mind, and to give to plaintiff all and every assurance in his power that plaintiff should not be harmed or wronged by any one on the train, but on the contrary said conductor did then and there follow up said talk and threats with the same and similar talk and  threats on his part, in the presence and hearing of plaintiff, and did then and there join with other persons on said train in talk and threats to do and commit the violence and wrong aforesaid to plaintiff; and  said  other  persons and said officer and servant of defendant continuing so unlawfully and wrongfully to threaten, plaintiff became yet more greatly alarmed and excited thereby, so much so that he became convinced in his mind that said persons and said officer and servant were about to and would carry their said threats into execution, and having good reason to fear and actually fearing that he would be

robbed and thrown from the train and thereby lose his life, as he honestly believed, he was forced to jump and did jump from said train while the same was under full headway and motion, and in doing so the left foot was broken, mashed and torn, which caused plaintiff great pain and suffering, and he was compelled to have, and did have, his leg amputated below the knee, and he has thereby lost the same for life; whereby, etc. Then follows statement of damages and prayer for judgment for ten thousand dollars.

The answer was as follows: "Now comes the defendant herein and for amended answer to plaintiff's first amended petition, by leave of court, denies each and every material allegation therein contained. And defendant further answering says that the facts as stated in plaintiff's said amended petition never did occur ; neither have they any existence in truth and fact, but are solely the product and offspring of a drunken and debauched imagination, or of a perverted and alienated mind. And defendant further says that if it be true that plaintiff did jump from defendant's train at the time charged in said petition, that the act of plaintiff in so doing was caused by excessive use of strong intoxicating drink, long debauch or mental alienation, and not by reason of anything said or done on the part of defendant's agents, officers or employes, or of any omission or neglect of duty of the defendant, or its officers or servants, and having fully answered asks to go hence and recover of plaintiff its costs herein expended."

The reply was a general denial.

The cause was tried before Judge EDWARDS and a jury. The substance of plaintiff's own testimony in relation to the accident was as follows :

DIRECT EXAMINATION BY MR. SILVER.

"Q. You are the plaintiff in this case ? A. Yes, sir.

"*Q.* What is your name? *A.* William Spohn.

"*Q.* Where were you born? *A.* Germany.

"*Q.* What year were you born in? *A.* 1847.

"*Q.* About what time did you come to this country? *A.* I don't know.

"*Q.* How old were you? *A.* About twenty-three.

"*Q.* Do you remember the time, anything to remind you of the time you came to this country? *A.* No, sir.

"*Q.* Where did you live before you came to Jefferson City in this country? *A.* I was in New York three days.

"*Q.* After you came? *A.* When I just came here.

"*Q.* Then where did you go to? *A.* Philadelphia.

"*Q.* Whereabouts last did you live before starting west? *A.* I worked awhile in Philadelphia and in New Jersey.

"*Q.* And in Pennsylvania? *A.* Yes, sir,

"*Q.* And then afterwards in what state? *A.* After I left New Jersey I went to Philadelphia and then came here.

"*Q.* You started from New Jersey to come west? *A.* Yes, sir.

"*Q.* Where did you start from? *A.* I wanted to go to Salina, Kansas.

"*Q.* How did you happen to start to Salina, Kansas? *A.* Because a man went there from New Jersey; he went out there and wrote back it was nice out there, so I went out there, too.

"*Q.* You started to go? *A.* Yes, sir.

"*Q.* Where did you start from? *A.* New Jersey; I started from Philadelphia; I bought my ticket at Philadelphia.

"*Q.* What sort of a ticket was that; where did you buy the ticket to; from Philadelphia to what point? *A.* Philadelphia to Salina, Kansas.

"*Q.* Do you remember about what time that was ? *A.* No, sir.

"*Q.* Do you remember the time you were hurt, what year and month ? *A.* The sixth of March.

"*Q.* How many years has it been ? *A.* Seven years.

"*Q.* Well, after you started from Philadelphia, did you remain on the cars all the way through to St. Louis ? *A.* No, sir.

"*Q.* Where did you get off ? *A.* Columbia.

"*Q.* What do you mean, Columbia or Columbus ? *A.* It is a big town, I don't know which it is.

"*Q.* Don't you know what state ? *A.* No, sir.

"*Q.* Well, what did you do, then ? *A.* It was dinnertime, and I went off and ate dinner ; I was tired ; I did not want to ride any more, and I knew my ticket would run for a year, so I thought I would wait ; so I walked that afternoon, and walked down alongside the track, and then came to a little station and asked for the train.

"*Q.* What train did you ask for ? *A.* Salina, Kansas ; I went into the postoffice and asked the man if that was the right road, and I asked him if there was a house for me to stay over night ; the house was not very far over, and I went down, and the man said all right, you stay there ; and I stayed over night and ate my breakfast and straight came to St. Louis.

"*Q.* Did you get to St. Louis in the daytime or the night time ? *A.* It was night.

"*Q.* What did you do after you got there ? *A.* Went into the depot.

"*Q.* What else ? *A.* Nothing ; I drank a cup of coffee and ate a piece of bread, and waited.

"*Q.* Waited for what ? *A.* The train.

"*Q.* When you went to get on the train, what happened ? *A.* I asked a man what train goes to Salina, Kansas, and he told me the train ; and, when I went to the train, a colored man stood there, and he asked me for my ticket, and he said I should go in.

"*Q.* Did you go in? *A.* Yes, sir.

"*Q.* Did you have any baggage? *A.* Yes, sir.

"*Q.* Anybody in the car when you went in? *A.* Yes, sir; there were three men or boys.

"*Q.* Was that car far up or a back car? *A.* I believe it was far up.

"*Q.* Tell the jury whereabouts you took a seat in the car? *A.* I took my seat in the car pretty close to the middle.

"*Q.* What seat? *A.* The right-hand side towards the engine.

"*Q.* Who else was in the car when you took your seat? *A.* Three men.

"*Q.* Whereabouts were they sitting? *A.* They were sitting on the left-hand side, the first and second bench.

"*Q.* So these men were back of you? *A.* Yes, sir.

"*Q.* Across the aisle from you? *A.* Yes, sir; on the left-hand side, and I was on the right.

"*Q.* How long did you sit there before the cars started? *A.* I did not stay very long, about five or ten minutes.

"*Q.* How long before the car started were you in there? *A.* Five or ten minutes.

"*Q.* After you got in, the car started? *A.* Yes, sir.

"*Q.* Now state if you had any trouble with anybody in the car, and what it was and when it started? *A.* It was about half an hour after the car started.

"*Q.* Do you know about what time that train started? *A.* I don't know exactly what time, nine or ten; I can't think of it; I cannot swear what time.

"*Q.* How long had you been in St. Louis? *A.* I was not there at all.

"*Q.* Between trains? *A.* Might have been there half an hour; cannot tell for sure.

"*Q.* Well, after you got in the car and got your seat, and the train started, you noticed these three men in there, state if anything was said to you, and what?

*A.* When I came in, three men sat on the left-hand side ; I sat down, took my seat, and after about half an hour, the train went off, one of them said.: 'You, what do you want to go to Salina, Kansas, for?'

"*Q.* Who said this?   *A.* One of these three men ; he said : 'I would like to know what he wants to do in Salina, Kansas?'

"*Q.* What else did they say?   *A.* They said, 'Well, we ought to rob him, so that he cannot come back any more;' and then another fellow says : 'If he does come back we will get him anyway, we will watch him ;' well, they kept on, one would say a word, and they would laugh at each other, and then another would say something funny and then they would laugh again, and they kept it up for an hour and a half, and then they went to sleep ; then the conductor came in and got my ticket.

"*Q.* Did you have a through ticket on that road? *A.* Yes, sir ; while those fellows were fooling and talking about me, the conductor would look at them and laugh, and they would look at the conductor and laugh.

"*Q.* Did the conductor say anything at the time about you?   *A.* No, sir.

"*Q.* Just looked at you?   *A.* Yes, sir.

"*Q.* What had they said to make him laugh?   *A.* I don't know now ; I paid no more attention to them, because I thought they could do nothing because the conductor was there, and I knew that he was the boss.

"*Q.* You thought you were all right because the conductor was there?   *A.* Yes, sir.

"*Q.* Well, how long did the conductor stay in there?   *A.* Not very long.

"*Q.* Which way did he go?   *A.* He went back again.

"*Q.* What did he do with your ticket?   *A.* He punched it.

"*Q.* Did he give it back to you? *A.* Yes, sir; he pulled a piece off.

"*Q.* You had a ticket with coupons on, did you? *A.* Yes, sir.

"*Q.* He pulled some of it off, did he? *A.* Yes, sir.

"*Q.* You haven't that ticket with you? *A.* No, sir."

By Mr. Smith: "*Q.* You gave it to your lawyers, didn't you? *A.* Yes, sir."

Mr. Smith: "Well, I want that ticket produced."

By Mr. Silver: "*Q.* You say the conductor left then? *A.* Yes, sir.

"*Q.* Well, did these men talk any after the conductor went out? *A.* They fooled a little while and then went to sleep.

"*Q.* Was anybody else in the car then? *A.* I believe not, at the same time; I cannot remember whether anybody else was in the car then; if there was anybody in the car, they were some black fellows that belonged to the train.

"*Q.* You say there were some black fellows in there? *A.* Yes, sir.

"*Q.* What sort of fellows were they; what made you think they belonged to the train? *A.* They had lanterns and had a dress on like the train fellows.

"*Q.* Were they away when this talk was going on? *A.* I cannot remember if they were or not.

"*Q.* After the conductor went out, when did you see him again? *A.* I cannot remember any more whether he came in again or not. I remember that the train stopped in about an hour or an hour and a half at a little station, and then another man came and sat behind me, and then the conductor came in, too, and he sat there by that man right behind me, and then the train started again.

"*Q.* What occurred there between the conductor and this man; what did they say? *A.* As soon as they

came there, they were in there about one minute, when the conductor said to that man, 'That must be an onery son of a bitch, he ought to be punished.'

"*Q.* Who said that? *A.* The conductor. And the other man said to the conductor, ' Well, can't we punish him, haven't you got any straps?' And then the conductor said again, ' Yes, I have got straps, we will tie him and throw him out of the window,' and he said he had a good place to throw me out, and the other man said, ' Yes, that is a good place to throw him out.'

"*Q.* Well? *A.* Then he said, 'I suppose he has got a good deal of money.'

"*Q.* Who said that? *A.* The conductor. I thought they were after the money, and I put my hand in my pocket and said, 'Here is my money ;' he said he did not want it ; I said, 'What do you want to tie me for and throw me out of the window, I did you no harm,' and I put my money in my pocket again, and then the conductor said to that other man, 'We will get his money anyhow after we get him tied ;' well they staid there awhile yet; then both got up and each went out; one went this way and the conductor went back to the train, and the other man went towards the engine, and I felt sure they went to look if everything was all right, and were coming back again and tie me and throw me out of the window, and I thought it would be better for me to jump and save my life than it would be to be tied and thrown out of the window, so I went out the same door the conductor went out and I got on the lowest step and held myself, and I did not want to jump, I hated it; then the door came open from the next car and I thought that was the conductor.

"*Q.* That is, the car back of you? *A.* Yes, sir; as soon as the door went open I jumped out.

"*Q.* How did you jump? *A.* I jumped right straight out.

"*Q.* State where you hurt yourself? *A.* The train run right this way over my ankle (indicating),

and of course everything was mashed in here, and the doctor had to take off my foot; of course everything was mashed, bones and all.

"Q. Do you know which car run over you? A. No, I don't know which car of the train.

"Q. You were hurt by the train? A. Yes, sir, but I don't know which car.

"Q. Did you get up; what became of you then? A. I laid there.

"Q. How close to the track? A. There is a bank there.

"Q. What side of the track did you jump on, north or south? A. The bank side, the right-hand side as you go down; not on the river side, on the left-hand side as you go west, on the bank side.

"Q. How close do you say you were to the track? A. Two and a half feet.

"Q. What sort of a place was it? A. Nice and hilly; it was a nice place, woods are there; Mr. Munger came and got me; he had his horse there; he came over there and got me.

"Q. Who found you first? A. The railroad watchman.

"Q. How long had you been there before he found you? A. I cannot tell exactly; might have laid there an hour and three quarters, I cannot tell exactly.

"Q. Were you suffering much pain? A. Yes, sir.

"Q. How did you happen to get away from there? A. I laid there and seen some lights on the other side of the river; I did not know how it was there; I could not walk and I hollered like everything when I seen them lights on the other side of the river, and nobody came; all at once I seen way down the railroad track, I seen a light come up; I wished that light would come up; it came slowly, slowly, and after awhile it came nearer; then he heard me suffering; then he stopped and looked and said, 'Don't be afraid, just come here;' he said, 'What is the matter?'"

By Mr. Silver: "*Q.* You went away from there? *A.* Yes, sir.

"*Q.* Who took you away? *A.* Mr. Munger.

"*Q.* How did he happen to know you were there? *A.* The watchman told him.

"*Q.* Where did you go to? *A.* To Mr. Munger's house.

"*Q.* What time was it when you got there? *A.* It was night.

"*Q.* What did they do with you there? *A.* They laid me on the floor.

"*Q.* State whether or not the doctor was sent for? *A.* Yes, sir; Mr. Munger went to town and got Dr. Davison.

"*Q.* What did Dr. Davison do to you? *A.* He said he would have to have another doctor.

"*Q.* You need not mind what he said to you. What did he do to you finally, to your leg? *A.* I don't know; I cannot remember what he done right away; after the other doctor came, he cut it off.

"*Q.* Where did he cut it off, show the jury? *A.* It is off right above the ankle.

"*Q.* Above the ankle? *A.* Yes, sir.

"*Q.* How long were you confined to your bed with that leg, Mr. Spohn? how long were you at Munger's in bed? *A.* I was in bed I suppose about six or seven weeks, it may have been eight.

"*Q.* Who attended you, what doctors? *A.* Dr. Davison and Dr. Elston.

"*Q.* Where is Mr. Munger now? *A.* He is dead.

"*Q.* State whether or not he testified at the former trial? *A.* Yes, sir; he was here.

"*Q.* Where have you been living since you got up? *A.* First I lived with Mr. Munger, then from Munger's I went to George Schrimpf's, and from there I went to Hemmels'.

"*Q.* How long have you been at Hemmels'? *A.* Over six years.

"*Q.* Continuously? *A.* Yes, sir.

"*Q.* What did you do there? *A.* Attended to the store.

"*Q.* Did you suffer any during this time? *A.* Yes, sir; lots.

"*Q.* Tell the jury where you jumped off the train and why you jumped. (Objected to by defendant as incompetent and irrelevant, as that is for the jury to find; objection overruled, and defendant duly excepted.) *A.* They wanted to throw me off, and I thought it would be better for me to jump off if I wanted to save my life; that is the reason I jumped.

"*Q.* Did I understand you to say that the conductor said anything to the other passengers? *A.* The conductor did not say anything to them.

"*Q.* What effect did that have on you?"

Defendant's counsel objects; question withdrawn.

"*Q.* When did you first get frightened? *A.* When the conductor was there first I was not afraid because I knew that the conductor was there and he was the boss and had to help me, and when the conductor helped them then I was afraid, as he ought to help me seeing I was a greenhorn; that is what I believed.

"*Q.* State if you had been drinking any that night? *A.* No, sir.

"*Q.* Where had you been last drinking anything? *A.* I was drinking last at Columbia; that night was the last time.

"*Q.* Where did you get that whiskey that you drank? *A.* In Philadelphia.

"*Q.* How much did you get? *A.* About a pint.

"*Q.* Who gave it to you? *A.* A woman.

"*Q.* Who was the woman that gave it to you? *A.* She put some eggs and bread and meat in my sack and put in the whiskey.

"*Q.* Were you boarding there? *A.* I worked out in the country, and when I came in we stopped there.

"*Q.* Did she know you were going west? *A.* Yes, sir; that is the reason she gave me the whiskey.

"*Q.* What became of that whiskey? *A.* Well, I drank a little once in a while, and when I came to Columbus we stopped twenty minutes and I went in and got my dinner; I was tired of riding then and I staid over night; when I came through Columbus two men were unloading coal, and I asked them, I did not want to carry it any more, and I asked them if they did not want a drink, and they said they didn't care; so I took some first and then gave them the bottle, and that is the last drop I saw since I came to Jefferson City; I did not see any even.

"*Q.* You did not see any until you got here? *A.* No, sir; I did not drink anything more except coffee in St. Louis.

"*Q.* That was in Columbus, Ohio? *A.* Yes, sir.

"*Q.* After you left that town, how long did you travel before you got to St. Louis? *A.* I traveled till evening.

"*Q.* Late in the evening? *A.* Yes, sir; I believe it was dark; I know it was late; it was supper time.

"*Q.* Dark, was it? *A.* Yes, sir.

"*Q.* Then you didn't drink all that day? *A.* I traveled all that evening and stayed over night, and on the next day, till I came to St. Louis, never saw a drop.

"*Q.* Then you did not have a drop for a day and a half or more? *A.* No, sir.

"*Q.* Can you tell whether or not what you drank before you came to Columbus made you drunk? *A.* No, sir.

"*Q.* You had money, had you, when you left? *A.* Yes, sir.

"*Q.* How much did you have? *A.* I had eighty-five dollars.

"*Q.* When? *A.* When I came to Munger's.

"*Q.* How much had you when you left Philadelphia before you bought your ticket? *A.* I had one hundred and one dollars

"Q. How much did you pay for your ticket? A. I paid for my ticket, I am not sure, twenty-four dollars and some cents.

"Q. Did you buy anything else? A. A watch and chain and some clothing.

"Q. Then when you got to Munger's, how much had you left? A. Eighty-five dollars * * *

"Q. Was there any war going on when you came to this country? A. No, sir.

"Q. Any war going on in the old country? A. There was when I left.

"Q. What war was that? A. France and Germany.

"Q. You came to this country during the French and German war? A. Yes, sir.

"Q. You don't know when that was, do you, what year?. A. I don't know.

"Q. You said you were twenty-three years old, and born in 1847? A. Yes, sir.

"Q. You have not settled the doctor's bill yet, have you? A. No, sir.

"Q. Why haven't you? A. I haven't any money.

"Q. You owe it yet? A. Yes, sir."

CROSS-EXAMINATION.

On cross-examination, plaintiff detailed his travels from his birthplace in Germany to Philadelphia, Pennsylvania, and then testified as follows:

By Mr. Smith: "Q. When you got to Philadelphia, how. much money had you? A. One hundred and one dollars.

"Q. You said you had a hundred and one dollars when you left Jimmy Rowe? A. I might have had a couple of dollars more.

"Q. You bought a ticket straight through from Philadelphia to Salina, Kansas? A. Yes, sir.

"Q. Straight through? A. Yes, sir.

"*Q.* Straight as a string from Philadelphia to Kansas? *A.* Yes, sir.

"*Q.* And you rode without stopping to Columbus? *A.* Yes, sir.

"*Q.* When you got to Columbus you stopped? *A.* Yes, sir.

"*Q.* Why did you stop at Columbus? *A.* Because the train stopped, and it took twenty minutes for dinner.

"*Q.* You mean twenty cents for dinner? *A.* No, it stopped twenty minutes for dinner.

"*Q.* Then you left the train at Columbus? *A.* Yes, sir.

"*Q.* You left at dinner time, and the train went on without you? *A.* Yes, sir.

"*Q.* You took your carpet sack? *A.* Yes, sir.

"*Q.* You took your dinner and then leisurely strayed around and down the track, you said? *A.* I went around the town; yes, sir.

"*Q.* To what place? *A.* Around town.

"*Q.* Before you left Philadelphia, you stayed all night; where did you stay? *A.* They called him Toney.

"*Q.* Toney's wife gave you the whiskey? *A.* Yes, sir.

"*Q.* How much of this precious liquor was there? *A.* I didn't pay anything.

"*Q.* How much was there? *A.* A pint, I suppose.

"*Q.* You cannot remember? *A.* No, sir.

"*Q.* You are a merchant, you ought to know? *A.* We don't sell any of it at our house.

"*Q.* You don't know, then, whether that was a pint or a quart that this woman put in your carpet bag? *A.* No, sir; she put some eggs and meat in my kit.

"*Q.* Where did she put the whiskey? *A.* In my overcoat.

"*Q.* Did you taste it on the way to Columbus? *A.* Yes, sir.

" *Q.* Was it good? *A.* It was good.

" *Q.* Tip top? *A.* Yes, sir.

" *Q.* How many times did you taste it on the way from Philadelphia to Columbus? *A.* I don't know how many times, but I know it was good liquor, and I got a good dinner.

" *Q.* Did you say you did not taste it from Philadelphia to Columbus? *A.* I said I might.

" *Q.* Was it the kind that would make a man forget? *A.* Yes, sir; in seven years.

" *Q.* How much of this did you have when you reached Columbus; how much was left? *A.* The bottle was half or three-quarters full.

" *Q.* Then you must have drunk some of it? *A.* I might.

" *Q.* When you got out at Columbus, you say you took some of it there? *A.* No, sir.

" *Q.* You wandered out, then, with your carpet sack in your hand, down the track, until you met some men heaving coal? *A.* Yes, sir.

" *Q.* Then you took a drink with them, didn't you? *A.* Yes, sir.

" *Q.* Then you did drink in Columbus? *A.* That might be. *   *   *

" *Q.* Had you any liquor on the cars when you started from this little station on the cars going to St. Louis; you got on at a little station outside of Columbus? *A.* I don't know whether there was a station there or not.

" *Q.* State when you left Columbus; you walked out on the track that evening until you came to a little station, and there you inquired for a place to stay over night, and they showed you a place; you got breakfast the next morning and then got on the train and departed for St. Louis; you got no liquor there, did you? *A.* No, sir.

" *Q.* You had none with you? *A.* No, sir.

"*Q.* You got none at St. Louis? *A.* No, sir.

"*Q.* How was it, then, that you came to tell Dr. Davison that the men on the train fell out with you because you did not divide your liquor with them ; did he not testify to the fact at the former trial of this case, that you said when your leg was injured, that the reason the boys on the train fell out with you was because you would not divide your liquor with them ? *A.* Not as I know of.

"*Q.* I want you to state whether you did or not ? *A.* No, sir.

"*Q.* You did not make any such statement ? *A.* No, sir ; not as I know.

"*Q.* Will you state that you didn't ? *A.* I didn't.

"*Q.* Coming up on the train, then, when you got on the train at the station outside of Columbus, you presented the same old ticket that you bought in Philadelphia, didn't you ? *A.* I didn't buy any in Philadelphia.

"*Q.* You said awhile ago that you bought a ticket in Philadelphia for Salina, Kansas ? *A.* Yes, sir.

"*Q.* You got off at Columbus and walked to the next station, and there got on a different train, and that you rode on that train without buying another ticket ? *A.* Yes, sir.

"*Q.* It was the same ticket that you had when you arrived at Columbus, and you got on another train and they let you travel on the other train ; you got no lay-over ticket ? *A.* No, sir ; I gave him that ticket.

"*Q.* The conductor did not know that you were going to get off the train ? *A.* No, sir.

"*Q.* After getting off and you got a good dinner, you felt pretty good, and thought that you would take a walk ? *A.* Yes, sir.

"*Q.* You walked out to the next station and staid there all night? *A.* Yes, sir.

"*Q.* The next morning there came another train ? *A.* Yes, sir.

" *Q.*  You took that other train ?  *A.*  Yes, sir.

" *Q.*  And rode on the same ticket?  *A.*  Yes, sir.

" *Q.*  And when you got to St. Louis you walked into the depot and presented that ticket to the Missouri Pacific porter, who stood at the car, and you walked into the car there on the same ticket?  *A.*  Yes, sir.

" *Q.*  And you rode from St. Louis this way on that old ticket that you bought in Philadelphia?  *A.*  Yes, sir.

" *Q.*  You are sure there can be no mistake about that?  *A.*  No, sir.

" *Q.*  What time in the evening was it, did you say, that you left St. Louis?  *A.*  I can't tell exactly what time it was; I knowed it had to start at nine, but I don't know what time it did start.

" *Q.*  Do you know what time you got to St. Louis? What was the use of that watch?  *A.*  I looked at the watch once in a while, but I don't remember the time.

" *Q.*  Was it sundown?  *A.*  Yes, sir.

" *Q.*  It was about dark?  *A.*  Yes, sir.

" *Q.*  How long do you think you remained in St. Louis?  *A.*  I don't remember now.

" *Q.*  As much as half an hour?  *A.*  I don't remember how long; I guess about half an hour.

" *Q.*  And you then presented your ticket to this porter, and he showed you into the car, and you think the car you went in was pretty far forward?  *A.*  Yes, sir.

" *Q.*  Was it next to the baggage car?  *A.*  I cannot tell.

" *Q.*  What day of the week was that?  *A.*  I cannot tell that.

" *Q.*  You don't know what day of the week?  *A.*  No, sir.

" *Q.*  When you entered the train who did you say you saw?  *A.*  I seen three fellows.

" *Q.*  White fellows, or black fellows?  *A.*  White fellows.

"*Q.* Young, or old ? *A.* Middle-aged.

"*Q.* Did you look in their faces ? *A.* Yes, sir.

"*Q.* Were they old men, or young? *A.* Not so very old.

"*Q.* That is very indefinite. *A.* The oldest was about twenty-six or twenty-eight.

"*Q.* Were they well-dressed men, or shabby-looking fellows ? *A.* Nothing extra.

"*Q.* Did they look like robbers? *A.* No, sir; I don't know.

"*Q.* Were they dangerous-looking? *A.* Not dangerous.

"*Q.* Were they not pleasant-looking men ; were they not laughing and talking? *A.* They did not laugh when I came in.

"*Q.* Did you say you saw them? *A.* Yes, sir.

"*Q.* Were they not pleasant-looking men? *A.* They were dressed middling, not so fine, and not so common.

"*Q.* Didn't you say, on one occasion, they looked like drummers? *A.* I did not know anything like drummers then.

"*Q.* You have learned something since you have come out here, on the drummer question ? *A.* Yes, sir.

"*Q.* They were decent-looking men? *A.* Yes, sir.

"*Q.* There were three of them? *A.* Yes, sir.

"*Q.* Did they sit before or behind you? *A.* They sat behind me, on the left-hand side.

"*Q.* Diagonally behind you? *A.* Yes, sir.

"*Q.* How many seats back of you? *A.* About three or four, I guess ; maybe five.

"*Q.* And you entered into conversation with them? *A.* I did not say a word to them ; I gave them no answer.

"*Q.* You did not talk with them ? *A.* No, sir.

"*Q.* Didn't they have a drink of whiskey? *A.* No, sir.

"*Q.* Didn't you divide with them? *A.* No, sir; I didn't have a drop.

"*Q.* Didn't they offer you whiskey, and didn't you take it? *A.* No, sir.

"*Q.* Didn't you have whiskey, and drink it, and never offer them any? *A.* No, sir.

"*Q.* You are positive about that? *A.* Yes, sir.

"*Q.* You had no conversation with these people whatever? *A.* No, sir.

"*Q.* Did not open your mouth? *A.* No, sir.

"*Q.* Never told him where you were going? *A.* No, sir.

"*Q.* What your business was? *A.* No, sir.

"*Q.* I understand you to say that you never opened your mouth from the time you entered that car till you got to the point where you jumped off? *A.* Yes, sir, I did; I spoke to the conductor; I said, 'There is my money, if you want it;' he said, 'Put away your money, I don't want it;' the conductor said, 'I suppose he has got a good bit of money,' and so I put my hand in my pocket, and handed him the money.

"*Q.* You handed that money to the conductor? *A.* Yes, sir; and then he said, 'Keep your money, I don't want it; put it in your pocket.'

"*Q.* And then you said what? *A.* I said, 'What do you want to tie me for? what do you want to throw me out of the window for? I never done you any harm;' and he said it was all right, and I sat down and put my money in my pocket, and then the conductor said, 'We will get his money anyhow.'

"*Q.* How far were they sitting behind you? *A.* The next seat.

"*Q.* That was after you sat down? *A.* Yes, sir; they said that after I sat down.

"*Q.* What were those other gentlemen doing? *A.* They were asleep; they looked as if they were asleep.

"*Q.*    A cat nap?    *A.*    Yes, sir.

"*Q.*    How far were they sitting from the conductor and the other man you spoke of?    *A.*    Two or three seats.

"*Q.*    When you offered the conductor your money, as you stated, these three men seemed to be asleep?    *A.*    Yes, sir.

"*Q.*    They appeared to be asleep?    *A.*    Yes, sir.

"*Q.*    They said nothing?    *A.*    No, sir; not at that time.

"*Q.*    Nor did they look up?    *A.*    No, sir.

"*Q.*    Then, after this conversation took place, the conductor went out?    *A.*    Yes, sir.

"*Q.*    Which way did the conductor go?    *A.*    Back towards the train, and the other man went towards the engine.

"*Q.*    The conductor went to the rear, in the direction of St. Louis?    *A.*    Yes, sir.

"*Q.*    And the other man went in the Kansas direction?    *A.*    Yes, sir.

"*Q.*    What were these three men doing?    *A.*    They were still asleep.

"*Q.*    When you got up to go out were they still asleep?    *A.*    Yes, sir.

"*Q.*    What did you say to them?    *A.*    Nothing.

"*Q.*    These three same young men that you saw come on at St. Louis?    *A.*    Yes, sir.

"*Q.*    Did anybody else come into the car?    *A.*    No, sir.

"*Q.*    Had anybody gone out?    *A.*    No, sir.

"*Q.*    There were only eight men in there?    *A.*    Yes, sir; only eight men there.

"*Q.*    This man that came with the conductor, he came on this side of St. Louis, did he?    *A.*    This side.

"*Q.*    He didn't get on at St. Louis?    *A.*    I don't know whether he did or not; maybe he was in another car.

" *Q.* You stated that this other man got on at a little station this side of St. Louis ? *A.* Yes, sir.

" *Q.* How many hours had you been from St. Louis when he got on ? *A.* About an hour.

" *Q.* Did you notice the Osage river when you crossed it? *A.* I don't remember any river.

" *Q.* Did you see it that night ? *A.* I saw water.

" *Q.* Did you see what you know to be the Osage river that night ; do you remember? *A.* No, sir; I don't.

" *Q.* Did you start to get off as soon as you crossed the bridge ? *A.* I cannot tell whether I started before or after.

" *Q.* Do you mean to say that when you went out yourself and followed the conductor out, that there was only these three in the car left ? *A.* That might be except those black fellows.

" *Q.* Will you state the black fellow was not there ? *A.* I cannot swear whether he was there or not.

" *Q.* You went out and said nothing to anybody when you went out? *A.* No, sir.

" *Q.* You said nothing when you went out and stood on the platform ? *A.* No, sir.

" *Q.* How long did you stand there ? *A.* I might have stood there ten minutes, probably.

" *Q.* Do you think you stood there that long ; was it as much as fifteen minutes ? *A.* No, sir.

" *Q.* Was it as short a time as ten minutes ? *A.* I cannot tell you.

" *Q.* What is your recollection ? *A.* I might have been five, and maybe ten, and maybe only four.

" *Q.* You staid there some time ? *A.* Yes, sir.

" *Q.* And then you saw somebody coming out of the next car ; saw somebody coming to the door in the next car ? *A.* Yes, sir.

" *Q.* Did he open the door ? *A.* Yes, sir.

" *Q.* Did he have a lantern ? *A.* No, sir.

" *Q.* You didn't know whether it was the conductor or not ? *A.* No, sir.

" *Q.* You didn't wait to see ? *A.* No, sir.

" *Q.* You just concluded it was the conductor, and you are sure now you did not see who it was ? *A.* No, sir.

" *Q.* You don't know whether it was the black porter, the conductor or a passenger ? *A.* No, sir.

" *Q.* You saw no lantern ? *A.* No, sir ; as soon as the door went open I jumped out.

" *Q.* Had the conductor been carrying a lantern that night ? *A.* Yes, sir.

" *Q.* You state then that you did not know who the person was that opened the door, and whether it was the conductor, whether it was the porter, or whether it was a passenger ; you could not see who it was ? *A.* No, sir ; I did not see, but I thought it was the conductor.

" *Q.* You just thought so ? *A.* Yes, sir.

" *Q.* There is no mistake about that ? *A.* No, sir.

" *Q.* On opening the door, you were standing on the steps ? *A.* Yes, sir.

" *Q.* How many steps were there on that platform ? *A.* Two steps.

" *Q.* Two or three ? *A.* Yes, sir.

" *Q.* From this lowest step you leaped straight out ? *A.* I jumped straight out from the steps as soon as that door went open.

" *Q.* You leaped with all your might didn't you ? *A.* I know I jumped out.

" *Q.* At that time how old were you ? *A.* About twenty-three when I came to this country.

" *Q.* How old were you when you made this jump, this leap ? *A.* Thirty-five years.

" *Q.* You were in good health ? *A.* Yes, sir.

" *Q.* You were not crippled or lame then ? *A.* No, sir.

Spohn v. The Mo. Pac. Ry. Co.

"*Q.* You had all your limbs and was able to move yourself? *A.* Yes, sir.

"*Q.* In that condition you jumped offt he platform? *A.* Yes, sir.

"*Q.* How much was your weight then? *A.* I can't tell.

"*Q.* Weren't you ever weighed in your life? *A.* I was, but I don't know whether I was weighed before that.

"*Q.* Were you weighed before in your life, and if so, how much did you weigh? *A.* I cannot remember exactly.

"*Q.* About how much? *A.* About forty-five or fifty pounds, I cannot swear to it.

"*Q.* You weighed yourself since then? *A.* I sometimes weighed fifty, I mean about one hundred and fifty, and sometimes one hundred and fifty-five.

"*Q.* You were then as large as now? *A.* Yes, sir.

"*Q.* You were in good health, and weighed about one hundred and fifty-five pounds? *A.* Yes, sir; well I don't know whether I weighed one hundred and fifty-five pounds or not.

"*Q.* In that neighborhood? *A.* From one hundred and forty to one hundred and fifty.

"*Q.* Did you go to sleep coming up on the train? *A.* From St. Louis to here.

"*Q.* Did you go to sleep in coming from St. Louis to the place where you jumped off? *A.* No, sir.

"*Q.* Never went to sleep? *A.* No, sir.

"*Q.* Never nodded? *A.* No, sir.

"*Q.* Never spoke a word? *A.* No, sir.

"*Q.* Other people slept? *A.* Those three men slept.

"*Q.* And the porter? *A.* Yes, sir.

"*Q.* Didn't the conductor nod? *A.* No, sir.

"*Q.* Didn't the other man sleep? *A.* No, sir.

"*Q.* You slept none at all? *A.* No, sir; not from St. Louis to here, I did not sleep.

"*Q.* What business do you say you are engaged in now? *A.* Work in a store.

"*Q.* And have been for six years? *A.* Yes, sir.

"*Q.* Do you get any wages? *A.* Yes, sir.

"*Q.* What? *A.* First I got eight dollars a month, and then twelve, and now I get fifteen.

"*Q.* And found? *A.* Yes, sir.

"*Q.* Now, Mr. Spohn, when you jumped off the train, you say you jumped off, what part of your person struck the ground first? *A.* I cannot tell that.

"*Q.* Do you believe you hit on your feet? *A.* I cannot tell.

"*Q.* What is your impression? *A.* I don't know whether it was on my head or feet.

"*Q.* Did you receive any bruises or hurts anywhere except on the feet? *A.* I had a little bruise on the head.

"*Q.* Whereabouts? *A.* A little piece of the skin was torn off.

"*Q.* How big a piece? *A.* Just a little.

"*Q.* No bruises? *A.* The skin was off.

"*Q.* No bruises on your arm or on your body? *A.* Not that I know.

"*Q.* None on your hips? *A.* No, sir.

"*Q.* None on your chest? *A.* No, sir.

"*Q.* You didn't discover any? *A.* No, sir.

"*Q.* Afterwards you found there was a little bruise on the top of your head? *A.* Yes, sir.

"*Q.* There was a little patch of skin off? *A.* That is all, it bled a little.

"*Q.* That was the only bruise or hurt you had? *A.* That is all I know of.

"*Q.* When you jumped you struck the ground, how far do you think from the track? *A.* When I laid there I was away about two and one-half feet from the track.

"*Q.* How was the train running, as to speed? *A.* Towards Kansas City.

"*Q.* I mean how fast? *A.* I don't know how fast.

"*Q.* Was it going fast? *A.* Looked as if it was going fast.

"*Q.* Didn't you testify before that it was running like the dickens? *A.* It was running like the dickens, I don't know how fast that is.

"*Q.* What do you mean by running like the dickens? *A.* They ran fast.

"*Q.* How fast? *A.* I cannot tell how many miles an hour.

"*Q.* Well, it was usually fast? *A.* Yes, sir.

"*Q.* You know it was fast? *A.* Yes, sir.

"*Q.* You could see from the way objects passed you, you could see that it was going like the dickens? *A.* Yes, sir.

"*Q.* With that knowledge you jumped off? *A.* Yes, sir.

"*Q.* Did you see any bluffs along there? *A.* When I jumped out first I didn't see any.

"*Q.* You staid there, now, as I understand you, on that platform with your face to the bank and you saw the bluffs along there? *A.* Yes, sir.

"*Q.* And you could see them plainly? *A.* Yes, sir.

"*Q.* Didn't you turn your face around to see what was behind you? *A.* I don't know.

"*Q.* You saw the bluff there and rough conntry? *A.* Yes, sir.

"*Q.* You waited, didn't you, till you came to this very nice spot of ground to jump? *A.* I don't know.

"*Q.* You say there was no bank there? *A.* No, sir.

"*Q.* You say there was no bluff? *A.* I say there was no bluff there; I saw woods.

"*Q.* That is what made you jump off? *A.* The woods did not make me jump off.

"*Q.* As soon as the door opened, you went off? *A.* Yes, sir.

"*Q.* The train was going very fast, and you heard the door open, didn't see the man? *A.* No, sir; as soon as the door opened, I went out.

" *Q.* You did not see the man at all? *A.* No, sir.

" *Q.* You simply heard the door open? *A.* Yes, sir.

" *Q.* You cannot remember, you did not notice whether there was anybody in the car or not? *A.* No, sir; I cannot remember.

" *Q.* And when you heard the door open, without seeing who it was you made your leap? *A.* Yes, sir.

" *Q.* You were standing down there on the platform, with your hands out? *A.* I did not swear whether I had both or not.

" *Q.* You were standing in this position (indicating) with your back to the river, and your right hand towards the locomotive? *A.* Yes, sir.

" *Q.* Did you hold on with this hand, or both? *A.* I don't know which one; it may have been both.

" *Q.* You had your back toward the train? *A.* Yes, sir.

" *Q.* And the conductor was in the car on the left of you? *A.* Yes, sir.

" *Q.* And as soon as you saw the door open, you gave a jump without knowing who it was coming through? *A.* Yes, sir.

" *Q.* You say, then, when you reached the ground, you didn't know whether you laid right still or rolled over? *A.* I cannot tell whether I rolled over; I laid there and seen the lights across the river.

" *Q.* But when you struck the ground did you roll over? *A.* I cannot tell anything about it.

" *Q.* You cannot tell whether you lit on the back of your head or side, you don't know? *A.* No, sir.

" *Q.* You don't know what car went over you? *A.* No, sir.

" *Q.* Or how many cars passed by you; whether it was one, two or three? *A.* No, sir."

### REDIRECT EXAMINATION BY MR. SILVER.

" *Q.* Is this your first trip in this country? *A.* First trip.

" Q.   First trip west of Pennsylvania ?  A.  Yes, sir.

" Q.   While you were lying on that bank didn't any trains of cars go by ?   A.  Yes, sir ; one.

" Q.   Which way was it going ?   A.  It was coming to Jefferson City.

" Q.   You are certain there was a train ?  A.  Yes, sir ; because the watchman came to me and said, 'You wait a little bit, the train will come right away ;' and in five or ten minutes the train comes, and after the train passed—

" Q.   The train did come ?  A.  Yes, sir.

" Q.   You don't know which way it went ?  A.  No, sir.

" Q.   How many feet were you from the track ?  A. About two to two and a half feet."   *   *   *

By Mr. Silver:  " Q.  You testified how many times before this trial ?   A.   This is the third time.

" Q.   Did you ever hear of Jesse James ?  A.  Yes, sir.

" Q.   You say you have heard of him ?  A.  Yes, sir.

" Q.   Had you heard of him before you came west ? A.  Yes, sir ; I heard he was mean peoples, full of tricks and they never could catch him."

By Mr. Smith :  " Q.  You said you heard of him before you came out to Missouri ?  A.  I heard of him in Philadelphia.

" Q.   Were you afraid of him when you were in Philadelphia ; you heard of him in Philadelphia, and when you came to Missouri you were thinking about it ? A.  I don't know if I did or not.

" Q.   Didn't you think about it that night ?  A.  I might have.

" Q.   What do you say, I don't care how you fix it ?  A.  I cannot swear whether I thought of him or not.

" Q.   You thought of him when you were on the road ?  A.  I say I don't know for sure whether I thought of him or not.

"*Q.* What is your impression about it; what is your idea, your best recollection about it; is it your impression or best recollection that you did or did not think about it? *A.* If I did think about it I cannot remember.

"*Q.* Where did you see it, in a German paper or an American paper, or did somebody tell you about it? *A.* Somebody told me about it.

"*Q.* Was it before you came to the United States? *A.* I was here.

"*Q.* What year? *A.* I cannot tell.

"*Q.* Where were you living? *A.* Philadelphia.

"*Q.* Who told you? *A.* Somebody.

"*Q.* What did they tell you? *A.* That they were bad peoples because they did lots of tricks; those boys is bad fellows; that is what they said.

"*Q.* The boys that Mr. Silver means? *A.* Yes, sir.

"*Q.* But you cannot recollect the same now? *A.* No, sir; I cannot.

"*Q.* That is what they told you in Philadelphia? *A.* Yes, sir; that those Johnson boys were bad fellows.

"*Q.* And you were afraid of the Johnson boys when you came from Philadelphia? *A.* Yes, sir.

"*Q.* Which was it that you heard, did you hear the Johnson boys or the James boys that were the bad boys? *A.* The James boys.

"*Q.* Now, if you heard the name of the man, would you recollect that? *A.* No, sir; we were sitting around a table and we had a talk together; they did not say it to me.

"*Q.* They did not say what state they were in? *A.* They went around everywhere.

"*Q.* When you left Philadelphia, did you think of that any more? *A.* I might have; I cannot remember whether I did or not.

"*Q.* You expected to find these James and Johnson boys as much in one state as another? *A.* I didn't know where they were.

"*Q.* There was as much danger in Columbus as in Missouri? *A.* I don't know.

"*Q.* Were you afraid of them when you were on the train? *A.* I was afraid of those fellows and the conductor.

"*Q.* Were you afraid of the James boys on the train? *A.* I cannot remember whether I was afraid of the James boys or not.

"*Q.* You can't recollect whether you thought of the James boys after you left Philadelphia or not? *A.* Not for certain; no, sir.

"*Q.* How wide was the ground, the surface of the ground, from the end of the track to where the decline went off, where it went down like a hill, where you were lying? *A.* Down to the ditch?

"*Q.* Yes; where it comes to turn over the hill from where you laid to where it comes to a slant? *A.* I know what you mean, still I cannot tell you how far it was down to the river.

"*Q.* Suppose this is the place where you were lying when hurt, how much level ground was there outside of the track on the hill? what was the width of the ground? *A.* Well, it may have been two feet or two and a half feet outside of the track to where the hill went down; maybe it was only one, maybe it was three; I didn't measure it."

By Mr. Silver: "*Q.* You state there was a kind of a ditch there? *A.* Yes, sir."

By Mr. Smith: "*Q.* Was it twelve feet down to that ditch? *A.* Not as I know.

"*Q.* Was it open country? *A.* Yes, sir

"*Q.* Do you suffer any pain from your leg now? *A.* Yes, sir."

Defendant objected to question; objection sustained. At defendant's request, the court excluded all evidence of pain and suffering since the injury from the consideration of the jury.

Medical testimony was then given of the nature of plaintiff's injuries. It tended to show among other things that his left foot and ankle were crushed, and afterwards amputation was performed about four or five inches above the ankle. The physician who saw him on the night of the accident testified that he seemed to be unusually excited and frightened, and that he did not smell liquor in his breath.

Mr. Munger, who lived near the place of the accident, testified that he found plaintiff about two or three o'clock, A. M., and brought the doctors to him; that he was found about three miles west of Ewing Station and about a mile and a half east of Jefferson City. Witness heard the call of a trackman about a half hour after he saw the west-bound train pass, and went down and found plaintiff. It had been raining. hard that night until a few minutes before witness saw the train; that plaintiff's clothes were not wet but there were some mud spots upon them.

The foregoing was the substance of the evidence in chief for the plaintiff, upon which the court refused an instruction in the nature of a demurrer to the evidence, and defendant excepted.

On defendant's part, the evidence of a number of witnesses tended to contradict that given for plaintiff. Among them Mr. Gallagher, the conductor of the train, testified fully regarding the actions of plaintiff on the night of the accident. His evidence went to show that plaintiff had left the train at Ewing Station. He stated that before that time, during the trip, plaintiff had said (reaching into his pocket) that he would give all he had if they didn't hurt him. He thought him a "looney," and told a friend to look out for him. He was cross-examined at length. Some of his testimony will be referred to further in the opinion.

Expert evidence was offered on the same side tending to show that, if plaintiff had jumped off the train in full motion as alleged, he could not have been run over,

and would probably have received fatal injuries from the force of contact with the ground.

After the defendant closed, plaintiff offered in rebuttal, among other evidence, the testimony of two witnesses to conversations with Mr. Gallagher in which the latter was said to have admitted that plaintiff was scared off the train ; that parties on it were "codding" him with "bugaboo stories" which frightened him, and he then jumped off. These conversations of Gallagher were objected to, but the objections were overruled and defendant excepted.

There were special issues submitted to the jury on which findings were made, but they need not be recited.

After the usual motions for new trial and in arrest and saving of exceptions, the defendant took this appeal.

*Thos. J. Portis, J. L. Smith* and *F. M. Brown* for appellant.

( 1 ) The petition does not state a cause of action. *White v. Maxey*, 64 Mo. 552. ( 2 ) The demurrer to the evidence adduced by plaintiff should have been sustained. *Spohn v. Railroad*, 87 Mo. 74. Conceding the truth of the facts as stated by plaintiff the demurrer should have been sustained, because plaintiff's leaping from the train was not the natural, usual and probable consequence of the fault charged. *Putnam v. Railroad*, 55 N. Y. 108 ; *Henry v. Railroad*, 76 Mo. 288 ; *Haley v. Railroad*, 21 Ia. 15 ; *McGrew v. Stone*, 53 Pa. St. 463. ( 3 ) The court erred in admitting the testimony of the witnesses McCarty and Meyers. *Smith v. Railroad*, 91 Mo. 58 ; *City v. Raynard*, 80 Mo. 189 ; *Adams v. Railroad*, 74 Mo. 554; *Scovill v. Glasner*, 79 Mo. 455 ; *Aldridge v. Furnace Co.*, 78 Mo. 559 ; *McDermott v. Railroad*, 74 Mo. 554 ; *O'Bryan v. Kinney*, 74 Mo. 125 ; *Bank v. Murdock*, 62 Mo. 75. ( 4 ) Plaintiff should not have been allowed to tell the

jury "why, and for what reason, he jumped from the train." It was a question for the jury. *White v. Maxey*, 64 Mo. 562; *State v. Downs*, 91 Mo. 21. (5) Plaintiff's instructions numbered 2 and 3 are in conflict with those numbered 7 and 10 given for the defendant. *Frederick v. Allgaier*, 88 Mo. 598. (6) Instruction numbered 10, given for the plaintiff, is erroneous and is in conflict with number 3 given for the defendant. (7) The verdict is so at variance with common sense, and so opposed to the weight of evidence, that it should not be permitted to stand. *Spohn v. Railroad*, 87 Mo. 74; *Herring v. Railroad*, 57 Ill. 59; *Reid v. Ins. Co.*, 58 Mo. 429; *Campbell v. Hood*, 6 Mo. 218; *Carroll v. Paul*, 16 Mo. 240; *Baker v. Stonebraker's Adm'r*, 36 Mo. 345; *Price v. Evans*, 49 Mo. 396.

*Edwin Silver, John R. Walker* and *Edwards & Davison* for respondent.

(1) The petition states a cause of action. This was so held when the cause was here before. *Spohn v. Railroad*, 87 Mo. 74. (2) The demurrer to the plaintiff's evidence was rightly overruled. The evidence makes out a much stronger case for plaintiff than was contained in the first record in this court. His testimony has been abundantly corroborated. See argument, *supra*. (3) There was no error in admitting the evidence of witnesses McCarty and Meyer: *First*. The foundation for same was sufficiently laid. *Second*. The evidence as shown by the record was offered only for the purpose of impeaching Gallagher and was therefore competent. Citation of authority is hardly necessary to sustain this proposition. 1 Greenl. Ev., sec. 462. (4) The testimony of the witness Miller was objected to only on the ground that the record testimony of Gallagher was not produced. There was no evidence upon which to predicate this objection, and it was

rightly overruled. Besides the evidence was competent as impeaching testimony. ( 5 ) The answer to the question, why plaintiff jumped from the train, was competent. *First.* It went to the very marrow of the case, and the question and the answer were entirely proper. The cases of *White v. Maxey*, 64 Mo. 552, and *State v. Downs*, 91 Mo. 19, are not applicable. *Second.* Besides defendant made no specific objection to the evidence. ( 6 ) The testimony of ·Wm. Vogdt was competent. It was in rebuttal of defendant's evidence given by the witness Morris and Donnan. Besides no objection was made or exception saved to its admission. ( 7 ) As to the special issues : *First.* Those submitted to the jury properly presented all the material issues of the case. *Second.* Even if the court committed any error as to same, the matter will not now be reviewed, since the repeal of the law providing for them. *Hazell v. Bank*, 95 Mo. 60 ; *Wayne County v. Railroad*, 55 Mo. 77. *Third.* It was not fatal to the special findings that same were not signed by the foreman of the jury. *Berry v. Pusey*, 80 Ky. 170 ; *Vater v. Lewis*, 36 Ind. 294 ; *Morrison v. Overton*, 20 Ia. 465. ( 8 ) Instructions for plaintiff numbered 1, 2, 3, 4 and 5 are the same given by the court on the former trial, and were expressly approved by this court. *Spohn v. Railroad*, 87 Mo. 74. So instructions for plaintiff numbered 6 and 7 state the law as recognized and asserted .by this court in that case. ( 9 ) The instruction to the jury to consider the testimony of McCarty and Meyers only as affecting the credibility of Gallagher was eminently proper. ( 10 ) Plaintiff's instruction number 9 was properly given. See argument *infra.* ( 11 ) Defendant's instruction numbered $8\frac{1}{2}^{\circ}$ was rightly refused if for no other reason than that it assumed the train was running forty miles an hour. Besides the failure to give it was not assigned as error in the motion for new trial. ( 12 ) Defendant's instruction on the question of champerty was rightly rejected. *First.* There was no

evidence tending to show that Leaming was to carry the suit on at his own expense. *Second.* Champerty was a question that could arise only between Leaming and plaintiff. *Bent v. Priest*, 86 Mo. 476 ; *Pike v. Martindale*, 91 Mo. 268.

BARCLAY, J.—At the previous hearing in this court the first judgment was reversed and the cause remanded for a new trial. *Spohn v. Railroad*, 87 Mo. 74. Since then another trial has been had accordingly, and the present record furnishes a detailed account of the last hearing in the circuit court. The facts are now presented in much more intelligible manner than on the former appeal.

I. It is urged that the petition does not state a cause of action, but we do not concur in that view.

A carrier of passengers by railroad is bound to use the utmost practicable care, not only to safely transport its passengers, but to protect them in transit from violence and insults from those on the train, including fellow passengers. A failure to do so will render the carrier liable for any damages naturally and directly resulting therefrom. *Spohn v. Railroad*, 87 Mo. 74 ; 26 Am. & Eng. R. R. Cas. 252.

If the facts stated in the petition were sufficiently established by proof, they would constitute a meritorious cause of action.

II. Next, it is asserted that the demurrer to the evidence should have been sustained, and that such is the necessary effect of the ruling on the prior appeal.

It may be granted that the plaintiff's account of his experience smacks somewhat of the incredible. His story certainly borders closely on the marvelous. But truth is sometimes stranger than fiction, and we are not prepared to say, sitting in the cause as reviewing judges only, that the verdict, approved by an able judge of great experience and knowledge of men, should now be set aside because of the apparent improbability of

plaintiff's testimony.    He is evidently a man of very
simple mind, a foreigner by birth, far from his friends
and was alone in a country unfamiliar to him.    That he
was on the train in question is not disputed.    That he
either got off at Ewing Station, as defendant claims, or
jumped off soon after as he says, must be conceded.
Why did he get off?    The conductor of defendant
admitted that before the train reached Ewing's, plain-
tiff had offered him all his money not to be hurt, and,
without some such explanation as plaintiff's testimony
affords, his act in jumping off would simply be one of
madness.    Even accepting his story as true it shows
lamentable credulity on his part in believing what
strangers told him of their intent to rob him, tie him
and throw him off the train ; but if, in fact, he believed
them and offered the conductor money to avoid being
hurt, it was certainly the duty of the conductor to then
assure him of protection against the threats that seemed
so real and to insist on the discontinuance of a joke
( for if plaintiff's statements are true it probably was
such ) so seriously taken.

　　Viewing the plaintiff's testimony as a whole, in the
light of that given by other witnesses, we are not pre-
pared to say that his story is too incredible to be
possibly true, or to finally close the doors of the courts
upon him for that reason.    It must be borne in mind
that the first verdict was set aside because of the great
improbability of his statement as shown by that record
and that the present is the second finding in his favor.
The judge and the jury before whom plaintiff appeared
have both approved his story as true, and have rested a
substantial verdict and judgment upon it.    Our statute
law forbids, by clear implication, the granting of a
second new trial by the trial court on the weight of evi-
dence ( R. S. 1879, sec. 3705), and no jurisdiction is
given us on appeal in such cases to determine any other
exceptions than those expressly ruled by that court.
R. S. 1879, sec. 3774.    This being the state of our

law and there being a constitutional guaranty of a jury trial we do not feel at liberty to sustain the defendant's point now under consideration.

III. Error is assigned upon the admission in rebuttal of certain testimony for plaintiff intended to contradict statements made by conductor Gallagher, as a witness. This testimony consisted of the evidence of conversations had by witnesses with Mr. Gallagher a long time after the accident. The court by an instruction for plaintiff (numbered 8) limited the bearing of this testimony to its effect on the credibility of Mr. Gallagher; but defendant contends that it should have been altogether excluded, as requested by its instruction numbered ten, refused.

Declarations by an agent are usually inadmissible against his principal as original evidence when made after the event as mere narratives of it. Nor can such declarations be made evidence because of a mere denial of them by the agent as a witness in the cause. But where such statements or declarations relate to facts material to the issue on trial, concerning which the agent has testified, he may be contradicted by evidence of them, the same as any other witness, the proper foundation having been first laid for introducing them. Here plaintiff offered in rebuttal proof of statements by the conductor to the effect that parties were "codding" plaintiff and frightening him with "bugaboo stories," and that he jumped off the train. These statements were contradictory of the evidence of the conductor on his direct examination, that plaintiff did not jump off the train, and of his testimony that to his knowledge no. one had badgered plaintiff while on the train. These facts bore materially on the vital issues in the case. As sufficient foundation was laid for the contradicting testimony, by proper reference to time and place in the cross-examination of Mr. Gallagher, we see no error in the ruling of the trial court on this point.

IV.   It is further insisted that the court erred in allowing the plaintiff to answer the question :   " Why you jumped off the train and where you .jumped." The answer given was :   " They wanted to throw me off, and I thought it would be better for me to jump off if I wanted to save my life.   That is the reason I jumped."

No objection was made to the answer, other than that entered against the question of incompetency and irrelevancy.   It certainly was relevant for plaintiff to explain the reason for such an ' act on his part, in view of the important bearing which his belief at that time had on the issues in the cause under defendant's instruction numbered 3.

V.   Defendant next insists that the instruction number 9 given for plaintiff is erroneous, and, incidentally, that it is in conflict with instructions given for defendant.   Plaintiff's ninth instruction reads as follows :   " Reasonable cause to jump from the train, as used in the instructions given in this case, means a cause sufficient to have induced plaintiff having regard to his intelligence, experience in life, situation and surroundings at the time of his injury, to have jumped from the train while the same was in motion and under the circumstances in evidence in this case."

This instruction undertakes to furnish an interpretation for all the other instructions.   It is, hence, of vital importance in its bearing on them and on the result of the case.   By it the jury are authorized to consider the "intelligence and experience in life" *of the plaintiff* in determining whether he had reasonable cause to jump from the train, whereas instruction numbered 3 for defendant required the cause to be such " as reasonably to. have induced a man of *ordinary prudence* to believe his life was in danger, or that he was in danger of suffering great bodily harm," etc.

Instruction numbered 7, for defendant, also required the jury to find ( as necessary to plaintiff's recovery )

that the conduct of the passengers, etc., "was such as to convince a *reasonable man* that such threats would be carried into immediate execution."

We have been unable, after most thorough consideration, to harmonize these declarations with the ninth instruction for plaintiff. We think the defendant's instructions establish a different standard for gauging the conduct of plaintiff from that defined in his instruction. The reasonable apprehensions of a man of ordinary prudence furnish an entirely different guide, by which to judge the plaintiff's act in jumping off the moving train, from one based upon his "intelligence and experience in life," as mentioned in his ninth instruction.

We shall attempt, before we conclude, to indicate the proper standard for his conduct in that regard, but certainly both of those mentioned cannot be correct.

The defendant is not necessarily responsible for any act a passenger may do in consequence of some breach of duty on the part of its employes. It is liable only for such results as are natural and probable consequences of such breach of duty. The agents of defendant are not chargeable with knowledge of a passenger's "intelligence and experience in life." They are authorized to act upon the appearances before them where they have no other notice of the facts. They may have in charge an insane passenger, but unless that condition is obvious or is made known to the carrier, the latter would be justified in assuming him to be as he appeared.

Hence, if the language of instruction numbered 9 had been "apparent intelligence" it would have been nearer to the true rule; but any reference to plaintiff's "experience in life," in the connection mentioned, was obviously improper, in the absence of any evidence of defendant's knowledge or notice of it.

In the case before us, defendant is liable for such natural and probable consequences of the acts of its

conductor, as might have been reasonably anticipated, by a person of ordinary prudence and experience, to result therefrom, in view of the facts within his knowledge or open to his observation.

The apprehension of peril, which would excuse plaintiff's act in jumping off the moving train, must have been such as created in his mind a fear of greater risk to life or limb by remaining on the car than he encountered by his said act in attempting to escape ; and defendant would be liable for such conduct of its conductor ( already described ) as might have occasioned such act of the plaintiff only in event it might reasonably have been anticipated in the circumstances as the natural and probable consequence thereof, regard being had to the apparent intelligence of plaintiff and the circumstances of his conduct in the présence of the conductor before the injury.

The instruction numbered 9, for plaintiff, was more favorable to him than the law warranted, and on a retrial the instructions can be conformed generally to the views we have expressed.

VI.   In view of the result reached it is unnecessary to consider the points made regarding the special issues submitted to the jury, the law on that subject having been repealed since the trial in the circuit court.

From what has been said, it follows that the judgment should be reversed and the cause remanded.

It is so ordered, in which all the judges concur, except Judge SHERWOOD, who concurs specially, as stated by him below.

SHERWOOD, J.—I concur in reversing the judgment, and refer to what I have said in 87 Mo. 85.