INEZ ROSETTA CASE, RESPONDENT, v. ST. LOUIS PUBLIC SERVICE COMPANY, A CORPORATION, APPELLANT.—192 S. W. (2d) 595.

St. Louis Court of Appeals. Opinion filed February 19, 1946.

1030

*Carpenter & Cleary* and *Frank X. Cleary* for appellant.

*Henry C. Stoll* for respondent.

*Orville Richardson* of counsel.

1032

McCULLEN, J.—This action was brought by respondent, as plaintiff, against appellant, as defendant, under Section 3652, Revised Statutes Missouri 1939 (Mo. R. S. A., sec. 3652), for damages for the death of plaintiff's husband who was fatally injured when beaten by a colored man on one of defendant's Hodiamont street cars about 11:00 P. M. on August 6, 1944. A trial before the court and a jury resulted in a verdict and judgment in favor of plaintiff in the sum of $2500. After an unavailing motion for a new trial, defendant duly appealed.

Plaintiff's amended petition alleged that defendant, a common carrier of passengers for hire, failed to exercise the highest degree of care to prevent the death of plaintiff's husband, Charles Case, who, while a passenger on one of defendant's Hodiamont street cars in St. Louis, was assaulted and beaten by a fellow passenger whereby he sustained injuries directly resulting in his death.

Defendant's answer to plaintiff's amended petition was a general denial.

Defendant contends that the trial court erred in refusing to sustain its motion for a directed verdict made at the close of plaintiff's case and again at the close of all the evidence. Defendant's contentions make it necessary for us to set forth the evidence rather fully.

The evidence shows that defendant's Hodiamont street car line, where it crosses Maple Avenue, turns from a westerly direction to a northerly direction. The westbound street car makes a stop on Maple Avenue at Hodiamont before it turns north onto a private right of way. The streets which intersect Hodiamont line as it runs north from Maple Avenue are Horton, Bartmer, Suburban and Etzel Avenues, in the order named. The car on which the assault occurred was a new streamlined type of car with entrance doors at the front and exit doors at the middle of the car on the right side. The middle doors are also referred to as center doors. Seats, each accommodating two passengers, faced forward along both sides of the middle aisle. The seat for the motorman was at the left front of the car. There was a large mirror above him by means of which he could see back into the car. To his right was the fare box and entrance platform. Immediately behind the motorman, also referred to as operator, was a bar running from the left side of the car to the turnstile, with a chain hanging between the turnstile and the right side of the car. There were six seats on the right side of the car between the front entrance doors and the exit doors. Photographs showing the interior of the car were introduced in evidence

and in connection therewith the distance from the turnstile to the middle exit doors was estimated to be from twelve to eighteen or twenty feet.

It appears from the evidence that plaintiff's husband, Mr. Case, was on his way home and was seated alone on the right side of the car in the second seat forward of the middle exit doors: A colored woman and a colored man were seated behind him.

It was admitted by defendant that it owned and operated the street car; that Mr. Case was assaulted by a colored man and received injuries from which he died on the floor of the street car on the evening in question between 10:00 and 11:00 o'clock.

Albert Martin, a colored man who was a passenger on the car, testified that he was sitting with his sister on the left-hand side of the car opposite the center exit doors, a little in front of a white man who was sitting on the opposite side; that a little more than a block after the car had passed Maple Avenue his attention was attracted by a colored man who was sitting with a colored woman in the first seat forward of the exit doors of the car; that the colored man said something to the white man and then started up to the front of the car to the motorman; that the colored man spoke to the motorman about the white man who was sitting alone in his seat; that the colored man asked the operator if it wasn't against the law for a person to smoke in the car and the operator said it was, and the colored man told the operator that a man back there was smoking and he had asked him to quit but he didn't pay any attention to him. The witness further testified that the street car motorman then told the colored man to tell the other man to quit smoking; that the colored man said: "I did, but he didn't pay me any attention"; that the motorman then said to the colored man: "Tell him I said to quit smoking"; that the colored man then turned around and came back to the white fellow and the white fellow said something to him; that the colored man made a motion toward the white man, and the colored lady grabbed the colored man's arm. The witness did not see the white man do anything at that time. The next thing the witness observed was that the white man got up and went up to where the motorman was and talked to the motorman and asked the motorman if he had seen him smoking. The motorman said he did not see him smoking but that the passenger was complaining about him smoking; that the white man turned around and cursed the colored man; said he would make him mind his own business or would make him behave, and by that time the colored man rushed up, hollering something, and the white man said something and the colored man started hitting him. At this point the witness testified:

"Well, did anybody make an effort to stop this colored man from beating on the white man? A. Nobody but me. I went up there. He was hitting the man. So I went up and told him to stop. I went

up and told him, I said 'You ought not—,' I said 'You ought not to beat on the man like that.' He told me to get the hell out of the way, which I did.''

The witness stated that it seemed to him that the colored man was pounding on the white man so fast it might have been six or seven blows, or eight; that he was pounding on him pretty fast and hard. The witness further testified that the motorman did not at any time get up and interfere in the fight, and that he did not hear the motorman say anything to the colored man; that he saw the white man fall; that at the time the colored man was beating on the white man the white man was "kinda facing north like"; that the street car was facing north too; that he did not see the white man smoking at any time and did not smell any smoke. On cross-examination the witness testified that the street car came to a stop at Etzel Avenue and the colored man and the colored woman got off there, and other people also got off there, and that was where the body of Mr. Case was removed from the car.

Mrs. Hazel Sutter testified that she was a passenger on the street car; that she heard a constant talking but didn't pay any attention, but she heard the white man say, "You didn't see me smoking, did you?"; that the colored people went right on talking and the next thing she observed there was a woman's scream and somebody said, "Let me out of here," and the motorman opened the door; that she did not see anyone smoking and did not smell any smoke, and did not hear any profanity; that the only thing she heard the white man say was, "Well, you didn't see me smoking"; that the colored people were doing all the talking; that she didn't see any blows struck; that she heard constant talking and thought the colored people were talking to themselves; that she didn't notice they were talking to any passenger until she heard the white man say, "You didn't see me smoking"; that the colored people were annoying her by their talking.

Joseph Corley testified that he lived about a half block away from Etzel Avenue and the Hodiamont tracks; that he was a passenger on the car in question and had his wife and two children with him; that as he was going up to the door to get off the car at Etzel Avenue he heard a negro man say to a white man who was sitting alone in a seat next to a window, "You are not allowed to smoke in this car"; that he looked to see whether the white man was smoking and saw no smoke and smelled no smoke; that as the street car stopped and the witness started to get off, the white man started to get up and go toward the front of the car; that the colored man was then still standing in the aisle; that he did not hear any profanity and did not hear any of the conversation up in front of the car, but did see the first blow that was struck by the colored man; that after the white man was struck he fell forward over the turnstile; that when the colored man said to the white man, "You ain't allowed to smoke

here in this street car," it was in sort of a harsh voice; that as he and his wife were getting off the car he was taking care of one of his children and his wife was taking care of the other one; that the children were a boy and a girl, aged eight and six years respectively; that he had not seen the colored man go up to the motorman at any time and had not heard any of the discussion going on; that he was just getting off the street car when he saw the white man get up from his seat and go up toward the front of the car and that he was on the sidewalk opposite the front part of the car when he saw the colored man strike the white man; that his wife screamed when she was on the sidewalk.

Mrs. Dorothy Jordan testified that she was a passenger on the street car and occupied the very front seat on the right-hand side; that the first thing that attracted her attention was when the colored man walked up and talked to the operator; that she heard the colored man tell the operator that there was a man smoking in the back and the smoke was bothering his wife; that he asked the operator to make the man stop smoking; that the operator said, "Tell him I said to stop smoking"; that the colored man said he had already told him to stop smoking and he would not, and the operator then said, "Well, you tell him I said to stop smoking," and the next thing she knew was when the white man came up and talked to the operator and asked the operator if he had seen him smoking and the operator said no; that the white man pointed behind him and said to the operator, "Tell that so-and-so to leave me alone." At this point the witness testified:

"Q. And what, if anything, did the operator do? A. Nothing.

"Q. Did he get up at any time? A. Not that I saw."

The witness stated that she saw the colored man strike the white man; that she did not count the blows, but "would say from four to six possibly eight maybe less, maybe more;" that at the time he was struck the white man was standing at the turnstile facing the operator; that it seemed to the witness that the first blow struck the back of the neck of the white man and he slumped forward, and as he raised up the colored man hit him again and he went down, slumped forward; and that the colored man continued hitting him. The witness testified:

"Q. Did the operator do anything then? A. No, sir.

"Q. Did you hear the operator say anything? A. Not a word."

On cross-examination the witness testified that when the white man was struck he was standing right in the turnstile, leaning over talking to the operator; that the colored man seemed to be a bigger man than the white man; that the white man did not strike back at all; that when the colored man first came up to the front the car was in motion, but she did not know where the car was at that time.

On redirect examination the witness said that when she stated that at the time the colored man came up to the front of the car she believed the car was in motion, she was referring to the first time that the colored man went up to the operator; that the last time the colored man went up to the front the car was stopped.

Mrs. Ruby M. Dunard testified that she was a passenger on the street car and was seated with her friend Mrs. Hazel Sutter at the time of the happenings described; that she could hear the colored man say something about smoking, but didn't know whom he was talking to; that his tone of voice seemed like one of annoyance; that the smoke had annoyed him; that she wouldn't say the colored man was angry until he spoke the words, "You cannot call me that"; that she did not observe or smell any smoke on the street car; that she saw the white man when he went up front and saw the colored man get up then; that she saw the colored man strike the white man on the back of the head near the neck; that after the first blow was struck by the colored man the white man "just kind of wilted there and couldn't do anything"; that he "just became limp and slumped forward"; that he made a little motion to get up again and was hit again; that the operator did not do anything or say anything at that time.

On cross-examination the witness testified that the first she heard was the colored man saying something about smoking; that she thought this was after the colored man had been up in front of the car to the motorman; that she saw the white man come up to the operator and say something to the operator, but the witness couldn't understand him because she was either too far back or else the white man was talking too low; that when the colored man started forward and said, "You cannot call me that," the car was in motion; that the white man was struck while he had his back turned to the colored man; that the white man was struck several times after it looked to the witness like he was limp; that some of the passengers screamed and someone said, "Open the door," and another one said, "Let us out," and the door was opened; that it was a lady's voice she heard scream; that when the colored man started up to the front a lot of people jumped up and "there was a lot of excitement."

Mrs. Dolly Corley, wife of Joseph Corley, testified that she was a passenger on the car and was sitting in the second seat behind the middle exit door on the outside; that her husband was directly behind her with one youngster on his lap and she had the smaller youngster on her lap; that the first thing that attracted her attention was a rather loud and noisy talk on the part of the colored man accusing someone of smoking; that she heard him say, "I did so see you; you ain't going to smoke"; that while she was standing by the exit door waiting to get off the car the white man got up and walked up to the front and the colored man said to him, "You ain't going to ignore

me''; that the white man was not smoking as far as the witness could see, and she did not smell any smoke; that when the witness was getting off the car the colored man was still standing opposite the seat, or a step behind the seat, where he had been talking to the white man; that when she got off the car the colored man was about half way up to the front of the car and had started in motion, and that is what attracted her attention to him; that he took fast steps, but was neither walking nor running; that the operator was turned a little in his seat, sort of facing the white man, talking to him; that the colored man struck the white man in the back of the head and he went over the turnstile and slumped forward, and as he started to get up the colored man hit him again; that at that point the witness started screaming and the operator started to turn around out of his seat, and as the negro kept on pounding the white man the operator got up and turned his back to the front of the car. The witness was asked here, ''Q. Did he do anything else then?'', and answered, ''Not that I recall.''

On cross-examination the witness testified that when she first heard the colored man say, ''I did so see you; you ain't going to smoke'', she was still in her seat and the car was in motion; that while she and her husband stood at the center door waiting for the car to stop at Etzel Avenue she did not hear any conversation; that she did not hear the white man open his mouth at any time; that the white man was walking to the front of the car as the witness walked to the middle door and the car was then getting close to Etzel Avenue and coming to a stop; that the white man had already reached the turnstile by the time the car stopped at Etzel Avenue and was talking to the motorman, but the witness could not hear that conversation. At this point the witness testified:

''Q. You then got off and walked up toward the front of the car and you were up there near the front door, or front window? A. That is right. .

''Q. Between the front door and the front window, is that what you said? A. That is right.

''Q. Holding onto the bars? A. That is right.

''Q. And you were watching the occurrence taking place in that car? A. Yes, sir; by that time you could sense there was trouble in the air; that was before the first blow.''

On redirect examination Mrs. Corley testified that as she was standing at the door ready to get off the street car she observed a colored lady sitting in the last seat next to the exit door there; that she saw the colored man standing in the aisle arguing, and that the colored lady reached up and grabbed him by the arm and said, ''Don't do that''; that the street car was just about stopped at that time—had reached its stopping point; that from the time the car traveled from Suburban Avenue to Etzel Avenue and the witness got

off the car and walked up on the sidewalk along the side of the car to the front door it was approximately three or four minutes; that from the time the argument started in the car it took three or four minutes. The argument referred to by the witness she said was "just before we reached Suburban Avenue, from the time the first loud talking started. Q. And the car was in motion then when you heard this loud talking? A. Yes, sir; that was before we reached this Suburban Avenue. . . . Q. I see. Well, at any rate, as the car was at Suburban Avenue the first you heard then was this colored man say, 'I did so see you; you ain't going to smoke.' A. That is right."

T. F. Colvin testified on behalf of defendant that he was sixty-one years old; that his occupation was that of a street car operator; that he had been engaged as such about twenty-seven years; that he operated the car in question on the Hodiamont line on August 6, 1944; that August 6th was on a Sunday; that the first knowledge he had of a dispute that arose in his car on that evening was when he pulled up to Maple Avenue and Hodiamont Avenue to let off some passengers, and upon the car leaving there the colored man came up in front where the witness was seated operating the car and said there was a white man sitting in front of him smoking, and the colored man said, "I wish you would ask him to quit." The witness testified that he could see back in the car at all times and that he did not see anybody smoking in the car. At this point the witness testified:

"A. Well, I was kinda' busy running the car—the car was in motion—and I looked and didn't see anybody smoking; and I said, 'Well, when you go back, if there is anybody smoking back there, you tell him I said to quit smoking.'

"Q. You had no idea to whom he was referring? A. No, sir.

"Q. Now, what next occurred? A. Well, after the colored man went back to his seat, why I noticed the colored man standing up there by the side of him and talking, and I couldn't understand what he said. He was kind of making motions with his hands, that way (demonstrating).

"Q. A motion like he was going to hit him, or anything like that? A. No, not exactly; just seemed like he was pointing off what he was saying.

"Q. Could you understand what he was saying? A. No, sir.

"Q. Did the white man come up to you? A. After that; yes, sir."

The witness then testified that the distance from Maple Avenue over to Etzel Avenue was four blocks, in the following order: Horton, Bartner, Suburban, and then Etzel Avenue; that when the white man came up to the witness he said: "Operator, did you see me smoking?", and the witness said: "No, I never seen you smoking." At this point the witness testified:

"Q. Was there any other conversation had, or anything said then? A. Well, after that he just turned around, after he spoke them words to me, and said, 'That fellow back there said I was smoking.'

"Q. And what happened then? A. Well, it wasn't but just a second or two until he came up, the colored man came up in front..

"Q. What happened then? A. Well, then he says to the white man, he says, 'What did you call me?' And he not much more then got the word out of his mouth until he hit him."

The witness further stated that when the white man was struck he was "kind of turned sideways," about half turned; that the car was in motion; that it was then about fifteen feet of the regular stop at Etzel Avenue.

"Q. What did you do then? A. Well, I was right at the time trying to stop my car; and by the time I got it stopped and turned around it was practically all over.

"Q. Did you get up off of your seat right away and stand up, or did you have to set your brake, or anything like that? A. Yes, sir; I had to set my brake.

"Q. Did you intend to make a stop at Etzel Avenue? A. Yes, sir.

"Q. Well, for what reason? A. Well, I got a buzzer.

"Q. You mean someone rang the bell or buzzer? A. Yes, sir."

On cross-examination the witness testified that after the colored man said there was somebody smoking on the car he asked the witness to get the man to stop smoking. At this point the witness testified:

"Q. You didn't get up and go back there to investigate, did you? A. Well, I looked in the mirror and didn't see nobody smoking and I was pretty busy handling the car and I thought that if I went back there and nobody was smoking, why I would probably interfere with somebody, see, or maybe get into an argument or something.

"Q. So you didn't go back at all? A. No, sir; I didn't go back."

The witness stated that he did not know anything about the argument before making the turn at Maple Avenue; that the car made a stop at Maple and Hodiamont Avenues and then afterwards made a stop at Bartner Avenue and also at Suburban Avenue. The witness testified:

"Q. And which one of these stops at Bartmer and Suburban did you look up in your mirror to see whether there was any more trouble going on back there? A. Well, I noticed he was talking, and this colored fellow was motioning with his hands and talking back there.

"Q. And he was still standing at the white man's seat, wasn't he? A. Yes, sir.

"Q. And did you notice that when you made your stop at Bartner? A. Yes, sir.

"Q. And when you made your stop at Suburban you looked up in your mirror and you saw that the colored man was still standing there at the white man's seat? A. Yes, sir.

"Q. And at both these stops you noticed that the colored man was there talking or arguing and that he was using his hands in the course of his talk to the white man; is that right? A. Yes, sir.

"Q. The white man did nothing all that time? A. No, sir.

"Q. And you still saw no evidence of any smoke, did you? A. No, sir.

.   .   .   .   .   .

"Q. And you knew then that there was some trouble between the colored man and the white man, didn't you? A. I knew there was something up some way, but I didn't know what it was.

"Q. By that time you knew the colored man was mad, didn't you? A. It seems to me he was.

"Q. And you knew that when you made your stop at Bartmer, is that right? A. Yes, sir.

"Q. And you will say now that at the time you made your stop for Suburban you also knew that? A. Yes, sir."

The witness testified that he saw a heavy colored man come up there about the time the fight started and make an attempt to break it up; that the heavy colored man came from the left side of the car, about four seats back from the front; that the heavy colored man went up there and caught hold of the colored man who did the striking and pulled him back.

"Q. Did the colored man quit then? A. After the white man was knocked down."

With reference to the heavy colored man, the witness testified;

"Q. Did he put his hand on this colored man that was doing the hitting? I mean, this heavy colored man, did he put his hands on the other one's shoulder? A. Yes, sir.

"Q. And the other one quit then, did he? A. He caught hold of his arm and pulled him back.

.   .   .   .   .   .

"Q. Did the fighting colored man, did he offer any resistance to the other colored man as he put his hand on his shoulder? A. No, sir.

"Q. He quit right away? A. Yes, sir.

"Q. Then I suppose he turned around and left the car? Did he? A. Well, yes, sir, the passengers got off. There was several passengers getting off right after the fight there and he got off with the rest of the passengers."

There is nothing in the record to show whether the colored man who committed the assault was ever apprehended, nor is there anything as to his name.

Counsel for both parties stipulated that the words "so-and-so," as used by some of the witnesses in their testimony, mean "son-of-a-bitch."

Defendant argues that the conduct of the colored passenger before he was cursed by Mr. Case, and called a bad name, was not such as to warn the operator of the street car that the colored passenger intended to strike Mr. Case; that the striking of Mr. Case was sudden and unexpected and could not have been anticipated by the operator of the car until the insulting name was directed to the colored passenger; that the operator of the car was under no duty to anticipate that one passenger would violate the law and strike another; that the court therefore erred in refusing to sustain its motion for a directed verdict in its favor. We are unable to agree with defendant's contentions.

In considering the evidence, we must, under the long established rule, take the evidence on behalf of plaintiff as true, disregard defendant's evidence in conflict therewith, and give plaintiff the benefit of all reasonable favorable inferences arising from all the evidence. Furthermore, a defendant's motion for a directed verdict can only be sustained when the facts and the legitimate inferences arising therefrom are so strongly against plaintiff as to leave no room for reasonable minds to differ. The above rules are so well known that we deem it unnecessary to cite authorities in support thereof.

In determining whether or not defendant's motorman negligently failed to protect Mr. Case from the assault of the colored fellow passenger, we must first ascertain what duty defendant owed to Mr. Case as a passenger on its street car. Our Supreme Court has held that a public carrier of passengers for hire "is bound to use the utmost practicable care, not only to safely transport its passengers, but to protect them in transit from violence and insults from those on the train, including fellow passengers. A failure to do so will render the carrier liable for any damages naturally and directly resulting therefrom." [Spohm v. Missouri-Pac. Ry. Co., 101 Mo. 417, 14 S. W. 880. (See the same case, 87 Mo. 74, 80).]

However, where there is no opportunity to discover the peril of the passenger, and no time and opportunity thereafter to avoid or prevent the injury, such as in the case of a sudden, unexpected and unforeseeable assault upon a passenger by a fellow passenger, the carrier cannot be held liable because not even the "utmost care" could prevent such an assault. To hold a carrier liable under such circumstances would be equivalent to holding it to be an insurer of the safety of its passengers, which would be unreasonable. [Lige v. Chicago, B. & Q. R. Co., 275 Mo. 249, 204 S. W. 508, 511.] However, although a carrier is not an insurer of the safety of its passengers, it is nevertheless liable for negligence which results in a passenger's injury, and it is under a

duty to exercise the "highest degree of care," sometimes referred to as the "utmost care," to prevent and avoid injury to its passengers. [Spohn v. The Missouri-Pac. Ry. Co., *supra*; Lige v. Chicago, B. & Q. R. Co., *supra.*]

The Lige case, *supra*, is heavily relied on by defendant herein. It is true that a judgment for plaintiff was reversed in the Lige case, but a reading of that case shows that it is clearly distinguishable from the case at bar on the facts. The evidence in the Lige case showed a sudden, unexpected and unforeseeable assault upon a passenger by a fellow passenger, whereas in the case at bar there was ample evidence to show the potentially dangerous situation of a continuous quarrel extending over a period of several minutes between a colored man and a white man involving the colored man's complaint against the white man's alleged offense of smoking on the car, in violation of the defendant's rules, and to the annoyance of the colored man and his wife. A careful and prudent person would know that such a situation had all the elements to cause an outburst of temper and heat on the part of both the participants. The jury could find that, by the exercise of the highest degree of care, defendant's motorman could reasonably anticipate from the continuing argument, and the determined attitude of the colored man, that his temper, as well as that of the white man, would, if the quarrel were not stopped, lead ultimately to a serious fight on the car.

We are not attempting to determine who was to blame for the quarrel as between the colored man and the white man. That question is not before us for decision. The fact that the white men called the colored man an insulting name toward the end of the quarrel was a matter for the consideration of the jury, along with the other evidence in the case. We are mainly concerned here with the duty that rested on defendant's servant in charge of the car, in view of the events which occurred right in his presence and of which he had knowledge before the assault took place.

Although in the Lige case, *supra*, the facts justified the conclusion reached, that case nevertheless, is also authority for the doctrine which warrants a holding in the case at bar on the facts herein that plaintiff made a case for the jury. In the Lige case, the court said:

"It is no longer a debatable question in this country that a common carrier of passengers for hire is bound to exercise the utmost practicable care to safely transport its passengers and to protect them while in transit from insults and violence at the hands of all on the train, including fellow passengers, and any violation of this duty which results injuriously to a passenger renders the carrier liable in damage therefor." [Lige v. Chicago, B. & Q. R. Co., 275 Mo. 249, 262, 204 S. W. 508, 511.]

In the case at bar the defendant's operator had the right and the power, and it was his duty, to preserve peace and maintain order on the street car that he was operating. [Spohn v. The Missouri-Pac. Ry. Co., 87 Mo. 74, 80; Hendrix v. United Rys. Co. (Mo.), 193 S. W. 812, 813.]

The conductor of a street car is not an official peace officer, but it is nevertheless "his bounden duty to preserve the peace on his car, and to prevent insult and injury to the passengers, and if to discharge this duty it should become necessary to call a policeman, we are satisfied that he should do so." [Grayson v. St. Louis Transit Co., 100 Mo. App. 60, 71 S. W. 730.]

It is also the duty of an operator of a street car to warn a passenger of any danger or menace to his safety. [Williams v. East St. Louis & S. Ry. Co., 207 Mo. App. 233, 232 S. W. 759.] His official character and position (being in charge of the car) are a power and he should try to prevent quarreling and fighting, and it is his duty to stop fights when they have begun. [Pittsburgh, Fort Wayne & Chic. Ry. Co. v. Hinds, 53 Pa. 512, 91 Am. Dec. 224, 227.] Furthermore, "he must when the occasion arises for his interference, bring to his aid all the force at his command." [Spohn v. The Missouri-Pac. Ry. Co., supra.] He should not wait for an overt act of violence to take place before intervening where a passenger's conduct is such as to reasonably warrant the inference that annoyance or injury to others may result if he does not intervene. [Lige v. Chicago, B. & Q. R. Co., supra (citing Thompson on Negligence, Revised Edition of 1902, Vol. 3, page 546, sec. 3089); Spalt v. Eaton, 118 N. J. L. 327, 192 Atl. 576, 579.]

It has been held that a public carrier is liable for subsequent insults and assaults where notice of the ensuing difficulty was first conveyed by arguments. [Koenig v. St. Louis Public Service Co. (Mo. App.), 45 S. W. (2d) 896, 898.]

Having in mind the rules applicable in considering defendant's motion for a directed verdict, as well as the duties of a public carrier of passengers referred to above, we are of the opinion that the evidence in this case was amply sufficient to warrant the trial court in submitting the case to the jury for their determination. The evidence shows without dispute that the motorman knew there was an argument between a colored man and a white man on his car, and we think the jury could reasonably find that he had this knowledge in sufficient time before the actual assault took place wherein, by the exercise of the highest degree of care, which it was his duty to put forth, he could have intervened and prevented the assault. The testimony of all the witnesses, including that of the motorman himself, shows that the motorman did nothing and said nothing to stop the quarrel. The quarrel began before the car reached Maple Avenue, where the car stopped. Thereafter, the quarrel continued while the car was moving from Maple

Avenue to Etzel Avenue, a distance of four blocks, during which period the car stopped at three of the four intersecting streets, including Etzel Avenue, to let off passengers. The assault did not occur until the car had come to a stop at Etzel Avenue, and not until after Mr. and Mrs. Corley had alighted there with their two children and had gone up to the front of the car on the sidewalk along side of the car, where they were when Mr. Case was struck the first blow by the colored man. Furthermore, according to the many eye witnesses, the motorman did not say or do anything to prevent the colored man from continuing to strike Mr. Case many additional blows after the first blow, from the effects of which Mr. Case slumped over the turnstile. It is true the motorman testified that the assault occurred so quickly that he did not have time to do anything. Such testimony, however, constitutes a mere conflict in the evidence which was a matter for the jury to determine.

We have set forth the testimony very fully and deem it unnecessary to review it here again. We think it is clear from the testimony, not only of plaintiff's eye witnesses, but of the motorman himself who was very frank and straight-forward in giving his testimony, that the trial court was amply justified in refusing to direct a verdict for defendant. It will be recalled that the motorman himself testified that when the colored man first complained of the white man smoking he looked in the mirror and didn't see anybody smoking, but nevertheless he delegated his authority, as the person in charge of the car, to the colored man to tell the white man that he (the motorman) said to stop smoking. This action by the motorman could have had no other effect than to intensify the bad feeling between the participants in the quarrel. Furthermore, the motorman stated that the reason he didn't go back to make an investigation was: "I was pretty busy handling the car and I thought that if I went back there and nobody was smoking, why I would probably interfere with somebody, see, or maybe get into an argument or something." The jury could properly believe from such evidence that the defendant's servant chose for his own reasons to refrain from taking reasonable precautions to prevent the quarrel from becoming more heated, and that proper steps at that time by the motorman might have prevented the injury and death of plaintiff's husband. Of course, we are not saying as a matter of law that defendant's motorman was negligent. We are simply saying that there was ample evidence to warrant the court in letting the jury determine whether or not the motorman was negligent.

Plaintiff, in her brief, moves this court for an award of additional damages under Section 140 (d) of the New Code, Laws of Missouri, 1943, page 395, which provides that: "Upon the affirmance of any judgment, . . . . the appellate court may award to the respondent such damages not exceeding ten per cent of the amount of the judgment

1046

complained of as may be just." We find nothing in this case that would justify us in assessing any such additional damages. The motion is overruled, and the judgment of the trial court is affirmed.

*Hughes, P. J.*, and *Anderson, J.*, concur.